In re DAVIS.

(District Court, N. D. New York. June 13, 1910.)

1. BUILDING AND LOAN ASSOCIATIONS (§ 11*)—DIVIDENDS—RIGHT TO SHARE IN.
   Where building and loan shares were held under an agreement that the holder should be credited in December of each year, his proportionate share of the net profits, provided he remained in until his shares reached their ultimate value, and that a withdrawal forfeited interest in the profits for the current year, his bankrupt estate, not having kept the monthly payments up after June in a particular year, is not entitled to credit for any dividends in that year.
   [Ed. Note.—For other cases, see Building and Loan Associations, Cent. Dig. § 13; Dec. Dig. § 11.*]

2. BUILDING AND LOAN ASSOCIATIONS (§ 35*)—FINES FOR NONPAYMENTS—BANKRUPTCY.
   On involuntary bankruptcy of a borrowing member of a building and loan association, the association's right to impose fines for failure to make stipulated payments ceases.
   [Ed. Note.—For other cases, see Building and Loan Associations, Cent. Dig. § 68; Dec. Dig. § 35.*]

3. BUILDING AND LOAN ASSOCIATIONS (§ 14*)—WITHDRAWAL—BANKRUPTCY OF MEMBER—PROFITS ACCRUED.
   Involuntary bankruptcy of a building and loan shareholder is not equivalent to a withdrawal so as to entitle the association to retain profits actually earned and duly credited.
   [Ed. Note.—For other cases, see Building and Loan Associations, Cent. Dig. §§ 16, 19; Dec. Dig. § 14.*]

4. BUILDING AND LOAN ASSOCIATIONS (§ 34*)—BANKRUPTCY OF MEMBER—RIGHTS OF HIS ESTATE.
   On involuntary bankruptcy of a building and loan association member, his estate was not entitled to credit for profits or interest on the dues paid for the time between the last apportionment and credit of profits and bankruptcy.
   [Ed. Note.—For other cases, see Building and Loan Associations, Cent. Dig. §§ 60, 62; Dec. Dig. § 34.*]

5. BUILDING AND LOAN ASSOCIATIONS (§ 39*)—MORTGAGES—FORECLOSURE—SALE BY TRUSTEE IN BANKRUPTCY.
   A sale by a trustee in bankruptcy of property mortgaged to a building and loan association was, in effect, a foreclosure sale.
   [Ed. Note.—For other cases, see Building and Loan Associations, Dec. Dig. § 39.*]

6. BUILDING AND LOAN ASSOCIATIONS (§ 34*)—LOANS—BANKRUPTCY OF MEMBER.
   On bankruptcy of a borrowing member of a building and loan association, the contract between him and the association governed the value of the shares and the application thereof on his mortgages.
   [Ed. Note.—For other cases, see Building and Loan Associations, Cent. Dig. §§ 60, 62; Dec. Dig. § 34.*]

7. BUILDING AND LOAN ASSOCIATIONS (§ 34*)—BANKRUPTCY OF MEMBER—EFFECT.
   A building and loan association borrowing member's bankruptcy did not accelerate the time when his estate was entitled to have applied the amount paid in on his shares.
   [Ed. Note.—For other cases, see Building and Loan Associations, Cent. Dig. §§ 60, 62; Dec. Dig. § 34.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**3. BUILDING AND LOAN ASSOCIATIONS (§ 34\*)—LOANS—PAYMENT—BANKRUPT-CY OF MEMBER.**

A building and loan association article permitting members to repay loans partly in cash and partly by credit for dues paid, on days when dues are payable, applies to the member's trustee in bankruptcy.

[Ed. Note.—For other cases, see Building and Loan Associations, Cent. Dig. §§ 60, 62; Dec. Dig. § 34.\*]

**9. BUILDING AND LOAN ASSOCIATIONS (§ 34\*)—LOANS—PAYMENT—NOTICE.**

Under a building and loan association article permitting members to repay loans partly in cash and partly by credit for dues paid, on bankruptcy of the member, the association was bound to take notice that the loan would be paid and that the dues paid would be applied to reduce the loan.

[Ed. Note.—For other cases, see Building and Loan Associations, Cent. Dig. §§ 60, 62; Dec. Dig. § 34.\*]

In the matter of Henry A. Davis, bankrupt. On motions to confirm and set aside special master's report. Order directed.

Charles A. Talcott, for trustee.
Dunmore and Ferris, for Homestead Aid Ass'n.

RAY, District Judge. On the 18th day of July, 1908, an involuntary petition in bankruptcy was filed against Henry A. Davis, and July 31, 1908, he was duly adjudicated a bankrupt. Soon thereafter John H. Grant was duly appointed trustee of the estate of said bankrupt, and an application was made for an order of this court granting permission to foreclose two mortgages on the real property of said bankrupt. Pending the application the trustee sold the property free and clear of incumbrance; the sum realized on the sale being $14,200. The proceeds of such sale were paid to said trustee, and pursuant to an order of this court $10,180.43 thereof, with interest at 6 per cent. from June 15, 1909, was paid to said aid association, and the association released the premises; it being provided in the order that such release should in no way affect its rights in the balance of such proceeds. In July, 1909, the trustee paid $840 to apply as interest on such mortgages.

The said Homestead Aid Association was incorporated under the act of the Legislature of the state of New York passed April 10, 1851 (Laws 1851, c. 122), "An act for the incorporation of building mutual loan and accumulating fund associations," and the acts amendatory thereof (Laws 1875, c. 564; Laws 1878, c. 96), and the purpose of the association, in its articles of association, is declared to be:

" 'The purpose of accumulating a fund to aid its members in acquiring real estate, making improvements thereon, and removing incumbrances therefrom; and for the further purpose of accumulating a fund to be returned to its members who do not obtain advances as above mentioned, when the funds of such association shall amount to a certain sum per share, to be specified in the articles of association,' and to adopt these articles of association."

August 4 or 9, 1904, said Davis, he having become a member of such association and taken 60 shares of stock therein, made a loan of

said association of $12,000, and secured the payment of same by bond and mortgage on his real estate on which he was required to pay monthly as interest the sum of $42 and also the sum of $18 per month as premium on such loan. On the shares of stock he was required to pay as dues monthly the sum of $1 per share. This made his monthly payments on loan and shares $120. He paid from July, 1904, to and including June, 1908, or regularly and continuously up to his bankruptcy.

On the 16th or 30th day of April, 1907, he made a second loan of $2,000, and taking out 10 additional shares secured the payment of such loan by his bond and mortgage on such real estate on which he was required to pay monthly as interest the sum of $7 and also $3 per month as premium and on the shares of stock monthly $1 per share or $10, making in all $20 per month which he paid up to and including June, 1908. He was not in default up to the time of bankruptcy.

On the first mortgage of $12,000 he had paid, as the special master or referee finds, $2,774 as interest and premiums, and on the shares taken with or at the time of obtaining that loan he had paid $2,880 as dues. All this had been paid under his contract made in becoming a member and obtaining the loan, and he was subject to the provisions of the articles of association of the said Homestead Aid Association, a copy of which was attached to his book of account with such association in his possession.

On the other mortgage of $2,000 Davis had paid $134.66 as interest and premiums, and on the shares taken with that loan he had paid dues to the amount of $150.

Each mortgage was accompanied by a bond, signed by Davis, which contained an assignment of the shares as collateral security for the payment of the principal of the mortgage and interest, premium on loan, fines, insurance premiums, taxes, assessments, and other charges as provided therein. The $12,000 mortgage recited and was conditional as follows:

"Whereas, by the terms and provisions of the articles of association of the Homestead Aid Association of Utica, of which the said Henry A. Davis is a member and shareholder, each shareholder therein is required to pay on each share held by him or her, as dues, the sum of one dollar monthly, on or before the third Monday of each month; and those taking loans therefrom are required, in addition to such monthly payments aforesaid, each to pay interest on such loans at the rate of four and one-fifth (4⅕) per cent. per annum, in monthly payments of seventy cents per month, on each and every two hundred dollars borrowed by them from said association, and also each at the same time to pay such monthly premium in addition to said interest on every loan purchased by him as he shall agree to pay at the time of making such loan, such payments of monthly dues, interest and premium, to be continued until the amount paid as dues in the series of which said Henry A. Davis is a member and shareholder shall, with the profits and income derived from investments, or other sources properly applicable to the shares in said series, be sufficient to divide and pay two hundred dollars for each share issued by the said association in said series, and then to cease; and whereas the said Henry A. Davis being a member and shareholder in said association on the 4th day of August, 1904, became entitled to receive from said association a loan of twelve thousand dollars, the amount of sixty (60) shares

held by him therein, upon furnishing proper securities, of which this obligation forms a part: Now, therefore, the condition of this obligation is such that if the above bounden Henry A. Davis, his heirs, executors or administrators, shall well and truly pay, or cause to be paid unto the Homestead Aid Association of Utica the said sum of twelve thousand dollars as follows: The sum of sixty dollars as dues, the sum of forty-two dollars as interest, and the sum of eighteen dollars as premium each and every month hereafter on or before the third Monday thereof. And such payment shall continue until the amount paid as dues on said sixty shares, together with the profits properly applicable to said sixty shares, shall amount to and equal said sum of twelve thousand dollars; and shall also pay all fines and other charges which said association shall or may impose on, or have against him, in accordance with the articles of association, and the by-laws of said association, now existing, to which reference is hereby made, or which may hereafter be adopted, and shall pay and perform all such other sums or things as may properly be required of him, under said articles and by-laws, or under this obligation, and the mortgage accompanying the same, then this obligation shall be void, otherwise to remain in full force and virtue."

There were also an interest, tax, and insurance claims not necessary to recite.

The bond accompanying the $2,000 contained the same recitals and provisions except as to dates and amounts.

Section 3 of article 8 of the articles of association provides that each stockholder shall pay monthly on each share of stock held by him the sum of $1 as dues to be paid on or before the third Monday of each month, and such payments are to continue until the value of the whole stock in the series of which the stockholder is a member shall be sufficient to divide to each share in such series the sum of $200.

Section 5 of the same article provides that when the amount paid in as dues in any series, together with the share of profits belonging to each series, shall amount to $200 for every share of stock in such series, such shares shall be said to have attained their ultimate value, and that the shareholders in such series shall then be paid off and their stock canceled.

Section 8 of the same article provides that:

"The value or present worth of each share of stock in this association, at any time, shall be the amount of dues actually paid in on the share of stock, with the proportionate share of net loss to that time deducted therefrom, or the proportionate share of net gain to that time added thereto."

Section 1 of article 9 provides that:

"Shareholders for neglecting to pay when due, either their monthly dues or monthly premium or loans, or interest, shall forfeit and pay as a fine the additional sum of ten per cent. thereof per month the first two months of such default and five per cent. thereof thereafter, until such dues, interest and premiums in arrears are paid, but no person shall be required to pay fines at any one time for a longer period than six months. Payments made by a shareholder, after he has become chargeable with any fines for his default shall first be applied to the liquidation of such fines."

No payments of dues were made after the bankruptcy of Davis. Articles 10 and 11 provide as follows:

"Article 10.

"Gains and Losses.

"Section 1. At the close of each fiscal year of this association, which shall be within sixteen days after the third Monday in December, in each

year, the profits of the association during the year shall be determined by deducting the actual amount of dues paid in, together with the profits that have been apportioned and credited on the books of the association, and the outstanding indebtedness, if any, from the actual assets. Out of said profits, the board of trustees may reserve each year, as a guaranty fund, a sum not more than ten per cent. of the net profits for that year, until such fund amounts to five per cent. of the net assets of the association, and said funds shall be at all times available to meet losses in the business of the association from depreciation of its securities or otherwise, and for no other purpose, and when reduced below five per cent. of the assets, said fund may be increased as above until it again reaches five per cent. of the net assets. Out of the remainder of the profits, the board of trustees shall each year declare a dividend which shall not exceed the undivided profits of the association. Said dividend shall be credited to the shareholders on the books of the association and in the members' passbooks, in proportion to the amount of dues paid in on their respective shares of stock, together with the profits credited to such shares on the books of the association, and to the length of time such payments and credits have been at the use of the association; and such dividends shall remain in the association until such shares reach their ultimate value of two hundred dollars, except as hereinafter provided.

"Sec. 2. If at the close of any fiscal year it is shown that there is an actual net loss, it shall be determined and apportioned, and charged among all stockholders in the same manner as provided for determining and apportioning and crediting the profits.

### "Article 11.

### "Withdrawals.

"Section 1. Any shareholder who has taken no loans from the association, upon making request in writing of the trustees, through the secretary, for permission to withdraw from the association, shall be permitted to do so, and upon such withdrawal shall receive the amount paid as dues on his or her shares, less his or her proportion of losses, that may have occurred, and also less any fines that may have been charged, or chargeable to such shareholder prior to his or her making and filing such application, and shall also receive of the profits that have accrued upon his shares up to the close of the fiscal year next preceding the filing with the secretary of his application for withdrawal as follows, to wit: On shares which have run not more than four years, three-fourths thereof; on shares which have run over four years, and not more than eight years, seven-eighths thereof; and on shares which have run over eight years the full sum thereof. Persons thus withdrawing from the association shall be paid according to priority in the date of their filing of their application of withdrawal. However, all money contracted to be loaned to shareholders at the time of the filing of such application for withdrawal, shall be first paid. The certificate or certificates of shares, held by the members who shall so withdraw from the association, shall be surrendered by them to the secretary of the association, and by him canceled before they shall be entitled to receive payment as above provided."

Section 9 of article 13, relating to loans, provides as follows:

"Shareholders who have borrowed from the association, may pay the amount borrowed upon one or more shares, upon any day set for receiving dues, by giving notice in writing to the secretary, at least two months previously, of their intention, and paying to the association the full sum of the principal of the loan on such share or shares, with the interest and any fines and expenses due thereon, and if such person fails to pay such loan at the time specified in such notice, a fine shall be imposed for such failure of one-half of one per cent. upon the amount of such loan, and said notice shall thereupon become inoperative; and said payment may be wholly in cash, or partly, by applying upon the loan the amount paid in as dues upon the share or shares upon which the loan was made and upon any shares over the required number pledged as

security for such loan, and such a portion of the profits credited on the books of the association to such share or shares as he would be entitled to receive upon a withdrawal, less his or her share of any losses that may have occurred up to the time of such prepayment, as such share may be determined by the trustees, and the remainder in cash. But when such loan is paid by the proceeds of a new loan from this association, the trustees may, in their discretion, allow the member paying such loan all the profits credited to his said shares on the books of the association. If the payment is wholly in cash, the shares pledged as security for whatever part of the loan is paid, shall be returned to the borrower, and he shall be wholly free and clear of further charge on account of that loan or part of loan for interest or premium."

Section 10 of the same article provides that stockholders having taken a loan on more than one share of stock may repay the amount loaned upon one or more of such shares upon the terms mentioned in said section 9, and thereby reduce their monthly payment of dues, interest, and monthly premium on such loan proportionately.

Section 13 of the same article provides:

"Upon the foreclosure of any mortgage given to the association, as provided for in the preceding section, the amount of the loan as expressed in such mortgage, with the accrued interest, the expenses of the foreclosure, all monthly dues, premiums on loans, insurance premiums and fines in arrears, and all taxes and assessments paid by the association, less the amount paid as dues, and such a portion of the profits earned by such stock as the mortgagor not being a borrower, would be entitled to receive upon a withdrawal up to and as declared in the last preceding annual report, less his or her share of any losses that may have occurred, shall be considered the amount due to the association. If such foreclosure proceeding shall be continued to a sale of the property embraced in the mortgage, the proceeds of the property on such sale shall be first applied to the payment of the costs and expenses of such foreclosure proceedings, and secondly to the payment of the amount of said mortgage as hereinbefore stated and set forth, together with the fines, insurance premium, taxes and assessments paid by the association, monthly premium on loan and interest due thereon; and the balance, if any, shall be paid to the mortgagor, his legal representatives or assigns; and upon such sale and application of the proceeds as aforesaid, all rights or interests of the mortgagor, his legal representative or assigns, to or in the shares of stock upon which such loan was had, shall cease, and the certificate of such shares of stock shall thereupon be canceled."

The special master or referee in computing the amount due to the said association has declined to allow fines accruing or incurred after the bankruptcy, if any were incurred, and has allowed to the trustee credit for one-half of the dividends that would have accrued to Davis in December, 1908, and to which he would then have been entitled as a credit had the payments been kept up regularly to that time. That is, if Davis had not gone into bankruptcy and ceased payments, but had kept them up, or if the trustee succeeding to his rights and ownership of the real estate and shares of stock, subject to such mortgages and to such assignment of such shares, had kept up such payments, in December, 1908, when the profits, etc., are figured and apportioned as provided by article 10, there would have been a credit of $195.98 for that year. As payments had been kept up for the first half of the year, the special master gave Davis or his trustee in bankruptcy credit for one-half of what that dividend to Davis would have been, viz.,

$97.99, less interest at 6 per cent. on the amount paid in, or $7.35, leaving the credit $90.64. He gets at it in this way:

| | |
|---|---:|
| Dues paid on both mortgages | $3,030 00 |
| Dividends credited prior to 1908 | 271 20 |
| Dues and dividends credited | $3,301 20 |

The referee as special master then says:

"Then, the said Davis had to his credit with said association at the time of his bankruptcy the sum of $3,301.20. This amount cannot be questioned; but I think a further credit as dividends should be made. From the testimony given by Sherwood S. Curran and on page 7 of his testimony he states that the bankrupt would have been entitled to receive a dividend of $195.98 for the year 1908. These figures are based on the supposition that payments had been made for each and every month of that year, when in fact only one-half of the yearly payments had been actually made. Now, it is my opinion that, if the yearly dividend for 1908 would have been $195.98, the bankrupt's estate should receive credit for one-half that sum, which is $97.99, less interest at the rate of 6 per cent. on the amount not paid in, which interest is $7.35. This would make the amount for which the bankrupt's estate should be credited by way of dividend for the year of 1908 the sum of $90.64. In deducting from one-half the dividend for 1908 the sum of $7.35, I have deducted a little more than the actual amount which should be deducted; but I have purposely done this in order to give the Homestead Aid Association of Utica all the credit that it can consistently ask. It is thus to be seen that the bankrupt's estate is to be credited with the amount of $3,301.20 plus $90.64, making the total credit which said association should give said estate as payment on these mortgages made by said Davis prior to the filing of his petition in bankruptcy $3,391.84."

| | |
|---|---:|
| The amount of the two mortgages July 1st was | $14,000 00 |
| The referee credits the said sum of | 3,391 84 |
| Leaving balance due July 1, 1908 | $10,608 16 |

He adds interest on this amount at 6 per cent. to January 17, 1910, at which date pursuant to an order of this court $10,540.14 was paid by the trustee, amounting to $984.77, less $840 interest paid by the trustee in July, 1909, or $144.77, making a balance of principal and interest January 17, 1910, of $10,752.93, from which he deducts such payment of that date $10,540.14—

| | |
|---|---:|
| Leaving a balance unpaid January 17, 1910, of | $212 79 |
| He adds a recording tax | 10 00 |
| Also premium on insurance | 15 08 |
| Total | $237 87 |

To this he says interest should be added from January 17, 1910.

The association challenges the allowance of said credit of $90.64, and says the bankrupt estate is not entitled thereto for the reason that no such dividend was ever declared, and that, not having kept up the payments after June, 1908, and the articles of association declaring that "dividends shall remain in the association until such shares reach their ultimate value of $200, except as hereinafter provided," and limiting a withdrawal of dividends or of any part thereof to those who have not made loans of the association, and, in such cases, to dividends accrued and credited for the preceding fiscal year, and providing that in case of foreclosure the "amount of the loan as expressed in such mortgage, with the accrued interest, the expenses of the foreclosure,

all monthly dues, premiums on loans, insurance premiums and fines on arrears, and all taxes and assessments paid by the association, less the amount paid as dues, and such portion of the profits earned by such stock as the mortgagor, not being a borrower, would be entitled to receive upon a withdrawal up to and as declared in the last preceding annual report less his or her share of any losses that may have occurred, shall be considered the amount due to the association," the allowance of such a credit for profits is not only inadmissible, but absolutely excluded.

If Davis had withdrawn in July, 1908, instead of going into bankruptcy, clearly he would not have been entitled to any share of the profits for 1908, subsequently computed and allowed to those who remained in the association. This is a provision of the contract. In case of a foreclosure the articles of association provide that only such dividends or profits shall be credited as "the mortgagor not being a borrower would be entitled to receive upon a withdrawal up to and as declared in the last preceding annual report" less, etc. I do not see on what theory we can ignore the contract when a member of the association goes into, or is forced into, bankruptcy, and the trustee, succeeding to the rights of the bankrupt, does not perform but makes a sale of the property. How can it be said that any profit for the six months of the year 1908 was earned July 1, 1908? Clearly no profit had become due to Davis, and the trustee did not keep up the payments, and the events on which an apportionment of profits to Davis depended never happened; the conditions of such an apportionment of profit to him were never performed. The profits actually apportioned as dividends in December, 1908, may have been earned largely during the last half of that year. Can the bankruptcy of the mortgagor and stockholder, Davis, be said to have changed the conditions in any way material here? I do not think it can be questioned that, had it been beneficial to the estate so to do, the trustee, on order of the court, could have continued the payments and reaped the benefits of so doing. It is apparent that there was a substantial equity in the mortgaged property, as it sold for about $2,000 over and above the amount due on the mortgages. The shares and the property might have been sold subject to the lien of the mortgages. In such event the purchaser could have continued payments reaping all the benefits, if any, of so doing. The property and shares might have been sold free and clear of all liens, and the mortgages paid from the proceeds. But this was not done, and after six months of default, and early in 1910, the property was sold by the trustee. The bond provides that after a default of six months the whole principal sum may be declared due. Foreclosure may be had, also, if there is default in the payment of any part of the sums agreed to be paid.

The only argument presented by the attorney for the trustee in defense of the allowance of this credit of one-half the profits that would have been apportioned to these shares of Davis in December, 1908, had he or his trustee continued the payments according to the

terms of the bonds and mortgages and articles of association, is as follows:

"Was it not just and equitable to make a credit to the estate for that period,. if not by apportioning the dividend for 1908, then by an allowance of interest for the first six months of 1908 on the total amount credited to the bankrupt at. the close of the previous year, $3,301.20? But this allowance of interest would exceed the amount of dividend as apportioned by the master. The report of the master is fair to the association. The mortgagee obtains the full amount of the mortgage debt with interest at the rate of 6 per cent. If the value of the bankrupt's interest were taken at the close of the year 1907, still the computation by the special master is somewhat more favorable to the association, because, as already stated, the amount of the dividend apportioned. for the first six months of 1907 is less than the interest on the total amount. to the credit of the bankrupt at the close of the year 1907."

I am not impressed with this reasoning. The contract, so far as it bound the mortgagor, and so far as it binds the trustee, must govern. It cannot be varied to meet the notions of the court as to what seems equitable or just. It was a condition of the loans to Davis that he become the owner of these shares, which he did. On the strength of such ownership the loans were made. The premiums to be paid on the loan of $1,200 with the interest amounted to $60 per month or 6 per cent. Then the dues, $60 per month, were paid on the shares and, so to speak, constituted a sinking fund, and the interest of the borrower—member—in these shares increased from month to month. His interest in these shares stood as collateral security for the loan and became more valuable as such with each payment. True, the association had the use and benefit of the money so paid in on the shares, but under a valid agreement, binding on both parties, that the shareholder should be credited in December each year his proportionate share of the net profits for such year provided he remained in until his shares reached their ultimate value. He had the right to withdraw, and in case he did he lost all right to share in the profits for the year ·in which the withdrawal took place, and also a certain part of the profits credited to him in previous years. See article 11, § 1, and article 13, § 9. This was a part of the contract deliberately made and made to encourage savings and payments. In no sense is it a forfeiture or a penalty for not remaining in or continuing to make payments of anything actually earned and to which the shareholder has become absolutely entitled. His right to share at all in the profits of a given year depends on his remaining in and making his payments to the end of that year. If he does remain and makes all his payments, he is credited his proportional share of such profits, otherwise not, and he has so agreed. But this credit is subject to a condition, viz., if he withdraws before his shares reach their ultimate value, his account is charged a certain per cent. of the profits before credited on the assumption he will remain in.

The referee or special master erred, I think, in allowing this credit of profits for 1908.

Did he err in rejecting the claim for fines and a so-called withdrawal fee? I think not. The fines are personal and imposed in the nature of a penalty for not making payments on the assumption they can be

made. When a person, being a shareholder, is forced into bankruptcy as Davis was, he loses control of his property, including the shares. They pass from him by operation of law. Can the fines be continued in case of bankruptcy in effect against the trustee and the property in his possession? I think not. He may not have property to make payments. The court might not permit it. The true reason for the imposition of fines has ceased to exist. Bankruptcy, a contingency not provided for, has occurred. By delaying foreclosure the fines would be increased, piled up. Clearly the trustee, an officer of the court, succeeding to the property by operation of law, cannot be fined, and I do not think the property which has passed to the custody and control of the bankruptcy court can be fined or depleted by fines imposed for defaults in payments occurring after bankruptcy—those of the trustee, an officer of the court, and who acts under the law and the orders of the court. Can they be regarded as stipulated damages in such a case for nonperformance of the contract and charged against the estate? I think not. It is beyond the power of the bankrupt to perform. The trustee cannot except by order of the court. I do not think it within the purview of the contract that fines, even if considered as damages, shall continue to be imposed in case of and after bankruptcy. I do not think that bankruptcy is the equivalent of a withdrawal, or that in event it occurs any deduction is to be made from profits earned and credited for previous years. Bankruptcy in this case was not a voluntary act. It was a misfortune and should not work to the advantage of the association or to the detriment of the estate in bankruptcy.

Bankruptcy does not vary the contract, but it presents a situation for which no special provision is made in the bond and mortgage or in the articles of association. Article 15 does provide for the death of a member; but I do not think that we can treat that article as applicable in case of bankruptcy. Still it shows the policy of the association in the case of death which creates a situation very similar to that of bankruptcy. In case of death the imposition of fines is not continued, and, as I construe that article, no deduction can be made from profits earned and credited for previous years.

I think it fair and just and within the terms of the contract and general rules of law applicable to say that, on the involuntary bankruptcy of a borrowing member of the Homestead Aid Association of Utica and the failure of the trustee to continue the payments: (1) The right to impose and collect fines ceases; (2) such bankruptcy does not operate as a voluntary withdrawal and gives to the association no right to retain profits theretofore actually earned and duly credited; and (3) the trustee of the bankrupt's estate has no claim and is not entitled to credit for profits or interest on the dues paid· for the time between the last apportionment and credit of profits and the bankruptcy.

One other question is presented by the association on this motion, viz., it claims that the amount paid in on the shares with profits credited thereto cannot be deducted from the mortgage debt so as to stop interest until some notice has been given of an intention to withdraw or have such amount so applied, and that 60 days' notice is required, and,

even if bankruptcy is the equivalent of notice, the application of such sum could not be made until September 1, 1908. But I think that, while this was not in fact a foreclosure sale, it was one in effect. When the property of the bankrupt came into the hands of the trustee charged with the lien of these mortgages, it became his duty to convert it into cash by a sale thereof in the mode pointed out by the bankruptcy act, the sale being within the control of the court, and to apply the proceeds to the payment of expenses of administration and dividends to the creditors. The mortgages were a lien thereon, and the shares of stock held as collateral were to be applied in reduction of the indebtedness at a value fixed by the contract between the parties, or to be ascertained in the manner prescribed by the contract between the parties, if any, or, if none, then in such manner as the court should determine. The association had a secured claim against the estate of the bankrupt, one secured by a mortgage and an assignment of the shares. In this case it is clear that the contract between the parties fixes the mode of ascertaining the value of the shares and provides for the application thereof on the mortgages. The amount paid in on the shares was not a debt due and owing from the association to Davis which he could demand and recover at any time he saw fit, and his bankruptcy had no effect to accelerate the time when his estate or trustee was entitled to have it applied. That was regulated by the agreement of which the articles of association formed a part. Article 14 provides that, on the death of a member who has made no loans:

"His or her legal representative shall upon surrendering his or her certificate of stock, be entitled by giving six months' notice in writing, to withdraw from the funds of the association, the full value of his or her stock at the time of his or her death, less his or her portion of losses or expenses incurred, and any fines chargeable to such member at his or her death."

And:

"Upon the death of any member who has made any loans from said association, his heirs or legal representatives by paying such loans, shall be entitled, upon like notice and upon the same terms as herein provided for nonborrowers, to withdraw the full value of his or her stock at his or her death. Notice must be given to the association within six months from such death or no accrued profits on said stock will be allowed. Such legal representatives may continue such membership by complying with the articles of association."

Section 9 of article 13, as quoted, provides that shareholders who have borrowed from the association may repay the amount borrowed on shares on any day set for receiving dues by giving notice in writing two months previously of their intention so to do and paying at the date fixed in the notice the whole principal with the interest and any fines or expenses due thereon, and such payment may be wholly in cash or partly by applying on the loan the amount paid in as dues on the shares on which the loan was made, etc. I think this section applies to trustees in bankruptcy, except that fines cannot be continued as I have stated. If the filing of a petition in bankruptcy is notice to all the world of such fact, and if also such notice of bankruptcy operates as notice of intention to pay, then, in such a case as this, the association had notice, a sufficient notice that the loan would be paid

and the shares applied in part payment in 60 days or thereabouts. The whole scheme and plan of the association seems to be that 60 days' notice is to be given when the amount paid in on shares is to be applied to the payment of the mortgage debt. I do not see how courts can inject into this contract by interpretation or judicial legislation a provision that in case of the bankruptcy of the borrower the trustee may wait so long as it pleases him for an opportunity to sell the property, then sell free and clear of the mortgages, and, having discontinued the payment of dues and being free from fines, have the amount paid in as dues and profits actually apportioned and credited to the borrower, the now bankrupt, applied in reduction of the mortgage debt as of the date of the bankruptcy on the theory, it must be, that the same then became due and payable to the trustee or the estate represented by him, not because of the terms of the contract, but by operation of law.

Now take the first mortgage: It shows on its face that it was executed August 9, 1904, and recorded August 10th. Davis paid $14 interest and premium that month, which paid to and including the 16th day of August, 1904; that is, for seven days. He had paid dues on the 60 shares in July and paid in August. He paid dues, interest, and premiums regularly according to the bond thereafter up to and including his June, 1908, payment. This paid interest and premiums to and including June 16, 1908. July 18, 1908, just before the payments of dues and interest and premiums for that month became due and payable, the petition in bankruptcy was filed. Sixty days from that date carries us to September 18, 1908, and I think that the association was bound to take notice that the loan would be paid and that the dues paid and credited to Davis would be applied to the reduction of the loan. This was a fair inference from the whole contract and the situation.

| | |
|---|---|
| Amount of mortgage........................................ | $12,000 00 |
| Interest and premiums to September 18th.................... | 184 00 |
| Amount September 19, 1908.................................. | $12,184 00 |
| Dues paid and profits credited............................ | 3,149 40 |
| Balance first mortgage September 18, 1908................. | $ 9,034 60 |

## Second Mortgage.

This mortgage was dated April 16th, but shows on its face that it was executed April 30, and was recorded May 6, 1907. Davis paid and was credited his dues for April and each and every month thereafter up to and including June, 1908, or $150. He was credited a dividend of profits in December, 1907, of $1.80, which makes $151.80 paid and credited on the 10 shares. In May, 1907, he paid the interest and premium for 14 days, $1.66, that is, to May 20, 1907, and he paid regularly thereafter up to the third Monday of June, which paid interest and premiums to June 20, or 21, 1908. The petition was filed July 18, 1908, and the July interest and premiums were not paid. Interest and premiums accumulated thereafter, of course.

| | | |
|---|---:|---:|
| Amount of second mortgage..................................... | $ 2,000 | 00 |
| Interest and premiums to September 18th........................ | 29 | 33 |
| | | |
| Amount September 18, 1908.................................... | $ 2,029 | 33 |
| Dues paid and profit credited.................................... | 151 | 80 |
| | | |
| Balance second mortgage September 18, 1908.................... | $ 1,877 | 53 |
| Amount of both mortgages September 18, 1908................... | $10,912 | 13 |
| Add interest and premiums to July 20, 1909, when trustee paid $840 | 549 | 24 |
| | | |
| | $11,461 | 37 |
| Deduct payment July 20, 1909................................... | 840 | 00 |
| | | |
| Balance July 20, 1909......................................... | $10,621 | 37 |
| Interest and premiums to January 17, 1910...................... | 313 | 29 |
| | | |
| Amount January 17, 1910...................................... | $10,934 | 66 |
| Deduct payment.............................................. | 10,540 | 14 |
| | | |
| Balance due January 17, 1910.................................. | $ 394 | 52 |
| Add insurance premium, $15, and interest........................ | 15 | 08 |
| Add recording tax.............................................. | 10 | 00 |
| | | |
| Balance due January 17, 1910.................................. | $ 419 | 60 |

The report of the referee or special master is disapproved and vacated; but I am not sure that the interest commenced to run at the dates I have mentioned, or that the payment of $840 was made July 20, 1909. The report says it was made during July, and the referee is evidently mistaken as to the date of the execution of the mortgages. The referee will make a new computation and report on the lines indicated by the above figures. In the absence of something to the contrary in the evidence, interest and premiums would commence with the actual execution of the mortgage. Still it may be that the $14 credited for August on the passbook paid to September 1, 1904, on the $12,000 mortgage, or some other date, and that the $4.66 credited on the passbook paid to June 1, 1907, on the $2,000 mortgage or some other date. The report should state the facts and show the dates when the loans were made, when interest and premiums commenced to run, and the dates when payments were made. The court should not be left to grope in the dark as to such matters.

There will be an order accordingly.